## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLE PILEGGI<br>3022 Euclid Avenue<br>Berwyn, Illinois 60402,<br><br>individually and on behalf of others<br>similarly situated,<br><br>     *Plaintiff*,<br><br>   *v.*<br><br>WASHINGTON NEWSPAPER<br>PUBLISHING COMPANY, LLC<br>1152 15th Street, NW<br>Suite 200<br>Washington, DC 20005-1799<br><br>     *Defendant*. | Civil Action No. 23-345 |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Nicole Pileggi files this Original Class Action Complaint against Defendant Washington Newspaper Publishing Company, LLC ("Washington Examiner"). Through its website, Washington Examiner is sharing its users' private video viewing information without obtaining the legally required consent. Plaintiff accordingly brings this action to recover damages on behalf of herself and all similarly situated individuals under the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA").

### Introduction

1. The VPPA protects consumers' privacy when they buy, rent, or subscribe to video content. In passing the VPPA, Congress recognized that the choice of what video content to watch, like the choice of which books to read, bears on important intellectual privacy interests. Like the rights of free speech and free association protected by the First Amendment, the VPPA's statutory privacy rights protect individuals' interests in determining their own opinions and affiliations.

2.      First passed in the wake of public disclosures of then-Supreme-Court nominee Robert Bork's private video rentals, the VPPA protects information "which identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). To enforce consumers' rights to keep their video viewing histories private, Congress created a civil cause of action against any video content provider who knowingly discloses consumers' personally identifying information. 18 U.S.C. § 2710(b). Remedies for violating the statute include actual damages, punitive damages, and/or liquidated damages of not less than $2,500.

3.      Courts have recognized that the VPPA, although passed in 1988 in the age of physical video cassette tape rentals, continues to apply with equal force in the online video streaming age. Because Congress defined "video tape service provider" broadly "to ensure that VPPA's protections would retain their force even as technologies evolve,"[1] companies that deliver videos online to subscribers are equally subject to its strictures.

4.      Washington Examiner is a conservative media company which, along with publishing internet news articles and a weekly magazine, delivers online video content to consumers on its website. These consumers include both persons who choose to subscribe to Washington Examiner's free email newsletter and paid digital subscribers.

5.      When consumers visit Washington Examiner's website, they can choose to visit pages with videos they find relevant or interesting and stream the videos using their internet browsers. These videos include politically charged content, usually with a conservative bent. Unbeknownst to the consumers, however, their video viewing is not private.

6.      In violation of the VPPA, since at least 2020, Washington Examiner has partnered with Meta Platforms, Inc. ("Meta") and its "Facebook" social media platform to collect personally identifiable information each time a consumer views a video on Washington Examiner's website. Simultaneously, as soon as a consumer decides to visit a video page on Washington Examiner's website, a tiny, invisible piece of computer code called the "Meta Pixel"

---

[1] *In re Hulu Privacy Litig.*, No. 11-cv-03764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012).

collects the page's address, including the video's title, and sends the information directly to Facebook, together with a digital ID that allows Facebook to match the information to the consumer's Facebook profile and all of the other information Facebook may have about that consumer's demographics, affiliations, and tastes.

7.     Washington Examiner benefits from this unauthorized disclosure by receiving enhanced analytics and advertising services, and Meta benefits by adding consumers' valuable information to its marketing databases, which it can then use to sell targeted advertisements. The only losers are the unwitting consumers. Without even realizing what is happening, they have valuable information about their opinions, tastes, affiliations, and private media consumption appropriated to fuel Facebook's multi-billion dollar advertising machine. Plaintiff brings this action to vindicate these consumers' rights.

## Parties

8.     Plaintiff Nicole Pileggi is an individual who during the relevant time period resided in Cook County, Illinois.

9.     Defendant Washington Newspaper Publishing Company, LLC ("Washington Examiner") is a Delaware LLC that does business in the District of Columbia, with its principal place of business at 1152 15th St. NW, Suite 200, Washington, DC 20005-1799. It may be served by service of process on its registered agent CT Corporation System 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060-6808.

## Jurisdiction and Venue

10.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff brings claims under the federal Video Privacy Protection Act, 18 U.S.C. § 2710.

11.     The Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the Class exceeds $5 million, and at least one member of the Class is a citizen of a state different from the Defendant's state of citizenship.

12.     The Court has jurisdiction over Washington Examiner, and the venue is proper under 28 U.S.C. § 1391(b), because Defendant does business in and is subject to personal jurisdiction in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

**Statement of Facts**

13.     Plaintiff Nicole Pileggi takes a keen interest in politics. She regularly reads books and internet articles and watches video content about political topics. Since approximately 2016, she has been a regular visitor to Washington Examiner's website at https://www.washingtonexaminer.com/. Ms. Pileggi's choices regarding the political media content she consumes are personal and not rightly the concern of anyone but herself and those with whom she chooses to share such information.

14.     Ms. Pileggi subscribed to Washington Examiner's newsletter. In order to subscribe, Ms. Pileggi was required to provide Washington Examiner with her personal information, including her email address and ZIP code.

15.     Ms. Pileggi has also had a Facebook account from approximately 2017 to the present.

16.     Ms. Pileggi has visited the Washington Examiner website and watched videos on the site since at least 2018.

17.     The videos Ms. Pileggi watched on the Washington Examiner website concerned political topics, including controversial issues and opinions that are unpopular among certain people with more liberal political views.

18.     Ms. Pileggi never consented to any sharing of her personal information or video watching history with any third party.

19.     Notwithstanding her lack of consent and unbeknownst to her, Washington Examiner sent information regarding Ms. Pileggi's activity on Washington Examiner's site to Facebook on at least 24 occasions.

20.     The private information Washington Examiner disclosed allowed Facebook to identify Ms. Pileggi and learn the internet addresses or universal resource locators ("URLs") of the pages she had visited on The Washington Examiner. These URLs included the titles of videos Ms. Pileggi had watched.

21.     As a result of Washington Examiner's unauthorized disclosure of her video watching history, Ms. Pileggi has suffered harm to her privacy interests and has been deprived of the economic value of her private information.

22.     Ms. Pileggi did not discover that Washington Examiner had disclosed her private video watching information to Facebook until 2022.

23.     Ms. Pileggi continues to desire to watch videos on Washington Examiner's website. She will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with the VPPA, she would use the Washington Examiner site to view videos in the future.

Class Allegations

**A.     The VPPA protects Americans from unauthorized disclosure of their video viewing history.**

24.     Congress passed the VPPA in response to a newspaper profile of then-Supreme Court nominee Judge Robert H. Bork, containing a list of 146 films that Judge Bork and his family had rented from a video store. *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016). The VPPA prohibits any disclosure of video records without the watcher's informed, written consent. Concerned that video watching history could be used to discover an individual's private tastes, affiliations, and opinions, Congress prohibited any "video tape service provider" from knowingly disclosing consumers' personally identifiable information to "any person." 18 U.S.C. § 2710(b).

25.     Under the VPPA, consumers who view video content have the right to keep their identities and video viewing histories private. To enforce this right, Congress created a civil cause of action allowing consumers to recover actual damages, liquidated damages not less than

$2,500, punitive damages, attorney's fees, and equitable relief for VPPA violations. 18 U.S.C. § 2710(c).

26.     The VPPA's legislative history notes that its authors were particularly concerned with protecting video-watching information because choosing what videos to watch is a core component of each person's intellectual privacy:

> There's a gut feeling that people ought to be able to read books and watch films without the whole world knowing. Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye.

S. Rep. No. 100-599 (1988).

27.     With remarkable prescience, Congress foresaw in 1988 that computer technology would create dangerous new privacy threats:

> The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before. Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes…. These records are a window into our loves, likes, and dislikes.

S. Rep. No. 100-599 (statement of Sen. Simon). Anticipating the consumer marketing databases that are so prevalent in the 21st century, Senator Leahy warned against "information pools" and the new privacy threat they posed. *Id.* (statement of Sen. Leahy). He noted that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.*

28.     Congress was particularly concerned with protecting the privacy of expressive activities, like choosing what video content to watch, because these activities implicate First Amendment rights and "directly affect the ability of people to express their opinions to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard." S. Rep. No. 100-599 (statement of Sen. Leahy).

29.     Consistent with Congress's privacy-protection goals, the VPPA defines "video tape service provider" broadly to encompass "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio visual materials*." 18 U.S.C. § 2710(a)(4) (emphasis added). By adding "or similar audio visual materials," Congress ensured that this definition, despite having been drafted in the days of brick-and-mortar video cassette rental stores, continues to be just as vital now that video providers more often deliver audio visual materials by other means, such as by streaming online video. *See In re Hulu Privacy Litig.*, No. 11-cv-03764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (holding that "Congress used 'similar audio video materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

**B.     Washington Examiner is subject to the VPPA.**

30.     Washington Examiner is a conservative media company that operates a news website and publishes a weekly magazine. Washington Examiner offers a wide variety of video content on its website. For example:



Figure 1: Washington Examiner Website Videos

31.     Because it regularly engages in the business of delivering video services over the internet, Washington Examiner is a "videotape service provider" subject to the VPPA. Much of this content concerns opinions that may be controversial or unpopular with people who hold more liberal views. The views expressed in these videos bear on individuals' First Amendment rights to freedom of association and freedom of speech.

32.     Washington Examiner's website invites consumers to subscribe to its content by signing up for its newsletter and/or paying for digital subscriptions. Both newsletter and paid digital subscribers must provide personal information, including their email addresses and ZIP codes. Paid digital subscribers must also provide their full names, addresses, and telephone numbers.



Figure 2: Newsletter Subscribers Must Provide Their Email Addresses and ZIP Codes

33.     Both newsletter and paid digital subscribers are "consumers" under the VPPA, because they provided personally identifiable information to Washington Examiner and requested that Washington Examiner send them content on a regular basis.

34.     Unbeknownst to the subscribers, Washington Examiner has knowingly deployed computer code on its website which tracks and reports their video watching history to third parties, including Facebook, the social media and advertising platform operated by Meta.

35.     This computer code, called a "tracking pixel" occupies only a single 1x1 pixel on a user's screen and is purposely designed to be invisible to users. The tracking pixel is a kind of analytics tool which allows website owners to track visitors' actions on their websites and measure the effectiveness of their advertising. Tracking pixels can collect interactions website visitors have with the site, including searches, form entries, and URLs viewed. Facebook's tracking pixel, called the "Meta Pixel," not only tracks and logs such website activity, but also sends it to Facebook, along with Internet Protocol ("IP") addresses, Facebook ID's, and other information that allows Facebook to identify the specific individual visiting the tracked website.

**C.     Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

36.     Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

37.     Facebook describes itself as a "real identity" platform. Sam Schechner & Bruce Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, The Wall Street Journal, Oct. 21, 2021, https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones (last visited Feb. 6, 2023). This means that users are permitted only one account and must share "the name they go by in everyday life." Meta, *Account Integrity and Authentic Identity*, https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/ (last visited Feb. 6, 2023). To that end, Facebook requires users to provide

their first and last names, along with their birthdays, telephone numbers and/or email addresses, and genders, when creating an account. Facebook, *Signing Up*, https://www.facebook.com/help/406644739431633 (last visited Feb. 6, 2023).

38.     In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads." Meta, *Facebook Unveils Facebook Ads*, (Nov. 6, 2007) https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/ (last visited Feb. 6, 2023). Facebook has since evolved into one of the largest advertising companies in the world. John Gramlich, 10 Facts About Americans and Facebook. PEW RESEARCH CENTER (June 1, 2021), https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/ (last visited Feb. 6, 2023). Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels. Meta, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 6, 2023).This allows Facebook to make inferences about users based on their interests, behavior, and connections. Meta, *Help your ads find the people who will love your business,* https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 6, 2013).

39.     Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users. Statistica, *Number of monthly active Facebook users worldwide*, https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/ (last visited Feb. 6, 2013).

40.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

41.     Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allows an advertiser to target users based on, among other things, their personal data, including geographic location, demographics (*e.g.*, age, gender, education, job title, etc.), interests, (*e.g.*, preferred food, movies), connections (*e.g.*, particular events or Facebook pages), and behaviors (*e.g.*, purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

42.     Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, New York Time (Apr. 11, 2018), https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html (last visited Feb. 6, 2023). Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

43.     To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. The Meta Pixel that Washington Examiner used on its website is one of Facebook's most powerful tools.

44.     The Meta Pixel is a snippet of code that, when embedded on a third-party website, tracks users' activities as users navigate through the website. Meta for Developers, *Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 6, 2023). Once activated, the Meta Pixel "tracks the people and type of actions they take." Meta, *Retargeting: Inspire people to rediscovey what they love about your business*,

https://www.facebook.com/business/goals/retargeting (last visited Feb. 6, 2023). Meta Pixel can

track and log each page users visit, what buttons they click, as well as specific information that

users input into a website. Meta, *About Meta Pixel*,

https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited

Feb. 6, 2023). The analytics provided by the Meta Pixel tool allow website developers to

improve "website operability" by giving developers insight into how customers use and interact

with companies' websites. Annie Burky, *Advocate Aurora says 3M patients' health data possibly*

*exposed through tracking technologies* (Oct. 20, 2022), https://www.fiercehealthcare.com/health-

tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last

visited Feb. 6, 2023).

    45.    In connection with the Meta Pixel, Facebook also places "cookies" on visitors'

computers. Cookies are small text files that web servers can place on a user's computer when the

user's internet browser interacts with a website server. Cookies are designed to help website

owners and third parties identify individual website visitors. Facebook's "c_user" cookie

contains the individual's Facebook ID, which allows Facebook (or anyone) to identify the

Facebook account associated with the cookie.

    46.    The Facebook ID is a short, unique string of numbers assigned to each user by

Facebook. Anyone who has access to the Facebook ID can use this identifier to quickly and

easily locate, access, and view a user's corresponding Facebook profile. One simply needs to log

into Facebook and then type "www.facebook.com/#," with the Facebook ID in place of the "#."

For example, the Facebook ID for Mark Zuckerberg is 4. Logging into Facebook and typing

"www.facebook.com/4" in any web browser retrieves Mark Zuckerberg's Facebook page:

www.facebook.com/zuck (last visited Feb. 6, 2023).

    47.    Facebook warns web developers that its Pixel is a personal identifier because it

enables Facebook "to match your website visitors to their respective Facebook User accounts."

Meta for Developers, *Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started

(last visited Feb. 6, 2023). When Meta Pixel is incorporated on a website, it can log what

searches users perform, which items they click on, which pages they view, and any other actions users take on the site. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify users. Meta Pixel tracks this data regardless of whether a user is logged into Facebook. Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, THE MARKUP (June 15, 2022), https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients (last visited Feb. 6, 2023).

48.     Meta Pixel takes the information it harvests and sends it to Facebook. Facebook can use the Facebook ID not only to readily identify individuals, but also to retrieve all of the other information Facebook has regarding that individual, including his or her friends, likes and dislikes, other websites visited, and demographic profile. Facebook can then share analytic metrics with the website host. Facebook also processes and analyzes the information to assimilate it into datasets like Facebook's Core Audiences and Custom Audiences. The consumers' information then becomes available for Facebook's advertisers to use when Facebook sells them targeted advertising services.

49.     Facebook stores this information on its servers, and, in some instances, maintains this information for years. *See* Todd Feathers et al., *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Feb. 6, 2023).

**D.     Washington Examiner knowingly collected subscribers' video viewing information and disclosed this information to Facebook without consent.**

50.     Tracking pixels are not necessary to a website's function. They do not enhance the users' experience, but rather solely benefit website owners and their third-party partners by providing them with valuable analytics and information that can be sold to advertisers. To obtain the code for the pixel, a website owner must contact Facebook and tell Facebook what kind of

events the site wants to track, such as pages or videos viewed. Facebook then returns the pixel code for the site administrator to embed into the website.

51.     Washington Examiner, following Facebook's instructions, has embedded Facebook's Meta Pixel code throughout its website. Washington Examiner thus knowingly embedded the Meta Pixel on its website understanding that it would cause consumers' personally identifiable information to be sent to Facebook, including on the website pages subscribers used to view video content.

52.     A third-party website like Washington Examiner that chooses to incorporate the Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

53.     Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. Meta, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 6, 2023). For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria. Meta for Developers, *Custom Audience*, https://developers.facebook.com/docs/marketing-api/reference/custom-audience/ (last visited Feb. 6, 2023). Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age. In essence, these businesses, like Washington Examiner, have chosen to barter their users' private information for access to Facebook's most advanced advertising tools.

54.     Because Washington Examiner chose to use the Meta Pixel, whenever Class members visited pages on Washington Examiner's website to view videos, the website's code automatically, simultaneously, and without Class members' knowledge or consent, caused their

personally identifiable information, including the titles of the videos they watched, to be disclosed to Facebook.

55.     For example, the screenshot below shows information sent by Washington Examiner's website to Facebook. To protect privacy, the individual's Facebook ID (the contents of the "c_user cookie" highlighted in the first red box) has been redacted:



Figure 3: Washington Examiner Sends Facebook ID
and Title of Video Watched to Facebook

56.     Washington Examiner could easily redesign its website to provide all of the services its subscribers use and enjoy without disclosing this private information to Facebook. Washington Examiner's use of the Meta Pixel does not enhance subscribers' experience on the website, but is instead a deliberate decision by *Washington* Examiner to benefit itself at the expense of subscribers' privacy.

57.     At no point did subscribers consent to the sharing of this information, nor were they even informed that their video viewing information was being shared with Facebook.

58.     This disclosure was not incident to Washington Examiner's ordinary course of business, because it did not occur as part of Washington Examiner's debt collection activities, order fulfillment, request processing, or a transfer of ownership. *See* 18 U.S.C. § 2710(a)(2).

59.     Washington Examiner thus knowingly and without Plaintiff's and the Class members' consent disclosed their video watching history and personally identifying information to third parties in violation of the VPPA.

**E.     Washington Examiner's unauthorized disclosures harmed Class members' privacy and deprived them of the value of their personal information.**

60.     This unauthorized disclosure of Plaintiff's and the Class members' personally identifiable information and video watching history violated their privacy interests, which Congress sought to protect by enacting the VPPA.

61.     The private information Washington Examiner disclosed also has economic value. As *The Economist* recognized in 2017, the "world's most valuable resource is no longer oil, but data." *The World's Most Valuable Resource Is No Longer Oil, But Data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/theworlds-most-valuable-resource-is-no-longeroil-but-data (last visited Feb. 6, 2023). In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people." Emily Steel, et al., *How much is your personal data worth?*, FINANCIAL TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/ (last visited Feb. 6, 2023). In 2015, *TechCrunch* reported that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user. Pauline Glikman & Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Feb. 6, 2023).

62.     Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings[2] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones. Saheli Chaudhry & Ryan Brown, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 29, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html (last visited Feb. 6, 2023). A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data. Sam Hawrylack, *Apps That Pay You for Data Collection*, CREDITDONKEY (June 12, 2021), *https://www.creditdonkey.com/best-apps-data-collection.html*, (last visited Feb. 6, 2023); *see also* Illia Lahunou, *Can You Earn Money From Your Data? Yes, You Can. And Here's How!*, MONETHA, *https://www.monetha.io/blog/rewards/earn-money-from-your-data* (last visited Feb. 6, 2023).

63.     In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price." Geoffrey Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 20, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Feb. 6, 2023). This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020. *Id.*

64.     In exchange for disclosing private information about its subscribers, Washington Examiner is compensated by Facebook with enhanced online advertising services, including but not limited to retargeting and enhanced analytics functions.

---

[2] Jay Peters, *Facebook will now pay for your voice recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app (last visited Feb. 6, 2023).

65.    Washington Examiner also monetizes this information by selling to advertisers the opportunity to market to its subscribers. In a 2021 Media Kit, Washington Examiner promoted itself to advertisers, touting that its website received 22 million unique visitors per month and served 20 million monthly video streams.



Figure 4: Washington Examiner Promotes Itself to Advertisers

66.    By disclosing this valuable information without Plaintiff's and the Class members' consent, Washington Examiner has deprived them of the economic value of their private video watching history. Many Class members, however, may not know that their privacy has been violated or may not have the ability to hire counsel and pursue their own claims. Plaintiff therefore brings this action on behalf of the Class to stop Washington Examiner's privacy violations and recover compensation for Class members.

F.      **The Class**

67.     Plaintiff brings this action on her own behalf and as a class action pursuant to

Federal Rule of Civil Procedure 23 for the following Class:

> All Facebook account holders in the United States who subscribed
> to Washington Examiner's newsletter and/or paid digital
> subscription and viewed video content on the Washington Examiner
> website from two years preceding the filing of this Complaint to the
> present.

Excluded from the Class are any employees, officers, or directors of Washington Newspaper

Publishing Company, LLC, any attorneys appearing in this case, and any judges or jurors

assigned to hear this case as well as their immediate family and staff.

68.     **Ascertainability**. The Class is ascertainable in that it is comprised of individuals

who can be identified by reference to purely objective criteria, including information from

Washington Examiner's and Facebook/Meta's business records. Notice may be mailed to Class

members using the information in Washington Examiner's files, as updated through the National

Change of Address Registry and other commercially available means.

69.     **Numerosity. FED. R. CIV. P. 23(a)(1)**. The Class is so numerous that joinder of

all members is impracticable. Although the precise number of Class members is not currently

known, the fact that Washington Examiner has more than 22 million unique visitors and 20

million monthly video streams shows that the Class likely consists of at least thousands of

persons and, therefore, it would be impracticable to bring all these persons before the Court as

individual plaintiffs.

70.     **Typicality. FED. R. CIV. P. 23(a)(3)**. Plaintiff's claims are typical of each

member of the Class she seeks to represent. These claims all arise from the same operative facts

and are based on the same legal theories.

71.     **Adequacy of Representation. FED. R. CIV. P. 23(a)(4)**. Plaintiff will fairly and

adequately protect the interest of the Class. Plaintiff is committed to vigorously litigating this

matter, and her interests are aligned with those of the Class. Plaintiff has retained counsel experienced in handling consumer privacy class actions.

72.  **Commonality and Predominance**. FED. R. CIV. P. 23(a)(2) & (b)(3). Common issues of law and fact exist regarding Plaintiff's and the Class members' claims and predominate over any individual issues. These common issues include:

> (a)  Whether Washington Examiner disclosed Class members' personally identifiable information to a third party;

> (b)  Whether Washington Examiner's disclosures of personally identifiable information were knowing;

> (c)  Whether Class members consented to Washington Examiner's disclosures of their personally identifiable information;

> (d)  Whether the Class is entitled to damages;

> (e)  Whether injunctive relief is appropriate to prevent further illegal disclosures of personally identifiable information.

73.  **Superiority**. FED. R. CIV. P. 23(b)(3). A class action is a superior method for the fair and efficient adjudication of this controversy. Class members' interests in individually controlling the prosecution of separate claims against Washington Examiner is small, as the maximum statutory damages recoverable by any one Class member is limited to $2,500 under the VPPA. Management of the Class's claims in a single proceeding will avoid inconsistent judgments and result in a more efficient use of judicial resources than resolving these same issues in many individual actions.

74.  **Injunctive Relief Appropriate to the Class**. FED. R. CIV. P. 23(b)(2). This action should also be maintained as a class action because Washington Examiner has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

**Claim**

**Count One – Video Privacy Protection Act, 18 U.S.C. § 2710**

**(On behalf of the Class)**

75.     Plaintiff incorporates the preceding paragraphs as though fully set forth here.

76.     Defendant Washington Examiner is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audio visual materials similar to prerecorded video cassette tapes in interstate commerce.

77.     Plaintiff and the Class members are consumers under the VPPA, 18 U.S.C. § 2710(a)(1), because they subscribed to Washington Examiner's services.

78.     Washington Examiner knowingly disclosed personally identifiable information which identified Plaintiff and the Class members as having requested or obtained specific video materials and/or services from Washington Examiner to a third party, Meta Platforms, Inc., without their consent.

79.     By disclosing Plaintiff's and the Class members' personally identifiable information, Washington Examiner violated their statutorily protected privacy rights and deprived them of the value of their private information.

80.     As a result of these violations, Washington Examiner is liable to Plaintiff and the Class members for liquidated damages not less than $2,500 per person, as well as punitive damages, costs, and attorney's fees.

81.     Injunctive relief and declaratory relief is also appropriate to prevent Washington Examiner from continuing its illegal conduct.

**Conclusion and Prayer**

WHEREFORE, Plaintiff, individually and on behalf the Class, respectfully requests that the Court enter judgment ordering relief as follows:

(a)     certifying the Class pursuant to Federal Rule of Civil Procedure 23(b)(3) and/or (b)(2);

(b)     appointing Plaintiff to represent the Class;

(c)     appointing Plaintiff's counsel as Class Counsel;

(d)     declaring that Washington Examiner is financially responsible for
        notifying all Class members about this suit;

(e)     enjoining Washington Examiner from further violations of the
        Video Privacy Protection Act;

(f)     awarding Plaintiff and the Class members liquidated damages of
        not less than $2,500 each and punitive damages pursuant to 18
        U.S.C. § 2710(c)(2);

(g)     awarding Plaintiff and the Class members reasonable attorneys'
        fees, expenses, and costs of suit, pursuant to 18 U.S.C.
        § 2710(c)(2), the common fund theory, or any other applicable
        statute, theory, or contract;

(h)     granting leave to amend the Complaint to conform to the evidence
        produced at trial; and

(i)     awarding such other relief as this Court may deem just and proper.

## Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all

claims so triable.

Dated: February 7, 2023                    Respectfully submitted,


                                By:     _/s/ Michael L. Murphy_____
                                        Michael L. Murphy (DC 480163)
                                        BAILEY & GLASSER LLP
                                        1055 Thomas Jefferson Street NW
                                        Suite 540
                                        Washington, DC 20007
                                        T: 202.463.2101
                                        F: 202.463.2103
                                        mmurphy@baileyglasser.com

Michael A. Caddell*
Cynthia B. Chapman*
Amy E. Tabor*
CADDELL & CHAPMAN
628 East 9th Street
Houston, TX 77007
T: 713.751.0400
F: 713.751.0906
mac@caddellchapman.com
cbc@caddellchapman.com
aet@caddellchapman.com

*Attorneys for Plaintiff*

*\* to seek admission pro hac vice*