**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLE PILEGGI, *individually and on behalf of persons similarly situated*, <br><br> *Plaintiff*, <br><br> v. <br><br> WASHINGTON NEWSPAPER PUBLISHING COMPANY, LLC, <br><br> *Defendant*. | No. 1:23-cv-00345-BAH |

**THE WASHINGTON NEWSPAPER PUBLISHING COMPANY, LLC'S
REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
<u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................................... ii

Introduction .................................................................................................................................. 1

Argument ...................................................................................................................................... 2

I.      Pileggi's Invasion of Privacy Allegations Do Not Satisfy *TransUnion* ............................ 2

II.      Pileggi's Allegations Do Not Plead a Violation of the VPPA for Multiple, Independent Reasons ......................................................................................... 6

         A.     Pileggi's Allegation that the Washington Examiner Disclosed the URL of Web Pages Fails To Plead a VPPA Violation ..................................... 6

         B.     Pileggi's Allegation that She Received a Free Email Newsletter that Did Not Provide Increased Access to Website Videos Does Not Make Her a Consumer Under the VPPA .......................................................... 8

             1.     Pileggi Alleges No Nexus Between the Email Newsletters and the Videos She Could Request or Obtain on the Washington Examiner's Website ................................................................................. 8

             2.     Only paying customers are consumers ....................................................... 9

         C.     Pileggi Does Not Allege that the Washington Examiner Knowingly Disclosed a Consumer's Information ...................................................... 11

         D.     The News Clips Pileggi Alleges the Washington Examiner Posts Are Not Similar to Prerecorded Video Cassette Tapes ............................................... 13

III.     The Court Should Dismiss the First Amended Complaint with Prejudice ...................... 14

Conclusion .................................................................................................................................. 15

# TABLE OF AUTHORITIES[*]

Page(s)

**CASES**

*Bancroft Glob. Dev. v. Koskinen*, 2017 WL 11579467 (D.D.C. Oct. 27, 2017) ........................... 14

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293 (4th Cir. 2018) ..................... 12

*Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........................................................ 4

* *Carter v. Scripps Networks, LLC*, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ........ 1, 2, 8, 9, 15

*Crane v. Am. Bar Ass'n*, 2023 WL 2603191 (E.D. Mich. Mar. 22, 2023) ...................................... 3

*Deering v. CenturyTel, Inc.*, 2011 WL 1842859 (D. Mont. May 16, 2011) ............................ 3, 4, 5

*Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015) .................................................... 10

*Feldman v. Star Trib. Media Co.*, 2023 WL 2388381 (D. Minn. Mar. 7, 2023 ..................... 3, 5, 6

*Flores-Figueroa v. United States*, 556 U.S. 646 (2009) ................................................................ 12

*Goldstein v. Fandango Media, LLC*, 2023 WL 3025111 (S.D. Fla. Mar. 7, 2023) ........................ 9

*Hanson v. Dist. of Columbia*, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ................................... 13

*Harris v. Pub. Broad. Serv.*, 2023 WL 2583118 (N.D. Ga. Mar. 20, 2023) ............................... 5, 9

*Hudson v. Am. Fed. of Gov't Emps.*, 308 F. Supp. 3d 388 (D.D.C. 2018) ................................... 14

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236 (11th Cir. 2022) ............... 3

*In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980 (N.D. Cal. 2020) ......................................... 4

*In re Hulu Priv. Litig.*, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) .................................. 10, 14

*In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015) ..................................................... 12

*Intel Corp. Inv. Pol'y Comm. v. Sulyman*, 140 S. Ct. 768 (2020) ................................................. 12

*Krukas v. AARP, Inc.*, 2021 WL 5083443 (D.D.C. Nov. 2, 2021) ................................................. 6

*Lebakken v. WebMD LLC*, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) ..................................... 8

*Mahoney v. United States Capitol Police Bd.*, 566 F. Supp. 3d 1 (D.D.C. 2022) ........................... 4

---

[*] Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

*Manigault-Johnson v. Google, LLC*, 2019 WL 3006646 (D.S.C. Mar. 31, 2019) ..................... 3, 4

\* *Martin v. Meredith Corp.*, 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023) .................... 1, 2, 6, 7, 15

*Perry v. Cable News Network, Inc.*, 854 F.3d 1336 (11th Cir. 2017) ............................................. 3

*Reyes v. Sessions*, 342 F. Supp. 3d 141 (D.D.C. 2018) ............................................................... 13

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014) ...................................................................... 11

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ........................................................... 2, 3, 5

*United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007) ............................................................... 13

*U.S. W., Inc. v. FCC*, 182 F.3d 1224 (10th Cir. 1999) ................................................................... 5

*Wheeler v. Panini Am., Inc.*, 2022 WL 17039208 (D.D.C. Nov. 17, 2022) .............................. 2, 5

*Wilson v. On the Rise Enters., LLC*, 305 F. Supp. 3d 5 (D.D.C. 2018) ...................................... 15

*Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482 (1st Cir. 2016) .......................... 10

## STATUTES

17 U.S.C. § 111(c)-(d) ................................................................................................................. 10

18 U.S.C. § 2710(a)(1) ................................................................................................................... 8

18 U.S.C. § 2710(a)(4) ................................................................................................................. 13

18 U.S.C. § 2710(b)(1) ................................................................................................................. 11

47 U.S.C. § 153(51), (53) ............................................................................................................. 10

47 U.S.C. § 228(c)(4) ................................................................................................................... 10

## OTHER MATERIALS

Compl., *Rodriguez v. The Hershey Co.*, No. 23-cv-398-BEN-DEB (Mar. 2, 2023) ...................... 8

Motion To Amend/Correct Complaint, *Bancroft Glob. Dev. v. Koskinen*,
    No. 17-cv-395-RC (D.D.C. July 28, 2017) ............................................................................ 14

Stipulation, *Martin v. Meredith Corp.*, No. 23-412 (2d Cir. filed May 16, 2023,
    docketed May 24, 2023) .......................................................................................................... 6

**INTRODUCTION**

Pileggi's opposition confirms that her allegations are far afield from the disclosures that prompted Congress to enact the Video Privacy Protection Act ("VPPA"). She does not allege that a modern-day equivalent of Blockbuster — such as Netflix or Google Play — told third parties which movies or television shows she rented, purchased, or streamed using her paid subscription. She instead alleges that the VPPA prohibits a news website operator from disclosing which web pages certain people visited, because those web pages contain short news videos and some visitors (though the website does not and cannot know which ones) also signed up for free email newsletters. While the VPPA retains an important, privacy-protecting role today, it is not the general internet privacy law that Pileggi needs it to be for her allegations to state a claim. The Court should dismiss the First Amended Complaint ("Complaint").

Pileggi's attempts to differentiate her allegations from those in *Martin* and *Carter* fail. Like the plaintiff in *Martin*, she alleges only that the Washington Examiner told Facebook which web pages she visited — not what happened once the web pages loaded. Like the plaintiffs in *Carter*, she does not allege that signing up for a free email newsletter gave her better access than any other website visitor to videos on the Washington Examiner's website. And while she repeats the reasoning of other courts — which do not bind this one — that held that a VPPA subscriber need not pay for her subscription, she does not defend that reasoning against any of the flaws we identified. Her failure to allege even that the Washington Examiner *could* know whether any given website visitor is also a newsletter recipient means she has not alleged the knowing disclosure of information about a consumer. And she does not explain why Congress used "similar" rather than "other" if, as she claims, it meant for the VPPA to apply to *all* prerecorded videos, no matter how dissimilar to the videos that had been available at Blockbuster in 1988.

As for standing, Pileggi claims to have alleged a type of injury *TransUnion* recognized as sufficient. But she has not. She does not allege any reputational harm akin to the public disclosure that someone is a potential terrorist — or any public disclosure at all. And with no allegation that the Washington Examiner's disclosures conflicted with the terms of its Privacy Policies, or that she manifested a lack of consent by attempting to opt out, she lacks the reasonable expectation of privacy necessary to allege any traditionally recognized invasion of privacy harm. As in *Wheeler*, her professed injury is, at most, a statutory violation that is too abstract to satisfy Article III.

For each reason, the Court should dismiss the Complaint. And because Pileggi already amended her allegations in response to these arguments — and could not cure the defects with further allegations — the Court should dismiss with prejudice, as *Martin* and *Carter* did.

## ARGUMENT

**I.     Pileggi's Invasion of Privacy Allegations Do Not Satisfy *TransUnion***

Like the plaintiff in *Wheeler*, Pileggi has alleged at most a "statutory violation[ ]," with injuries "too abstract to satisfy Article III standing's injury-in-fact requirement." *Wheeler v. Panini Am., Inc.*, 2022 WL 17039208, at *6 (D.D.C. Nov. 17, 2022). While her Complaint identified several potential injuries — including reputational and economic harm — her opposition relies only on her invasion of privacy allegations. Those allegations lack "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).

Pileggi claims (at 6) to have suffered "the same injury" as the *TransUnion* plaintiffs the Supreme Court held had standing. But those plaintiffs suffered a "reputational harm associated with the tort of defamation": third parties received credit reports that "labeled [them] a 'potential

2

terrorist.'" 141 S. Ct. at 2208-09.  Pileggi alleges nothing of the sort.[1]  Pileggi characterizes her injury (at 7) as "disclosure of private information" of the type *TransUnion* recognized could satisfy Article III.  *See* 141 S. Ct. at 2204.  But that injury arises only from the *public* disclosure of private information.  *See*, *e.g.*, *Hunstein v. Preferred Collection & Mgmt. Servs.*, *Inc.*, 48 F.4th 1236, 1246 (11th Cir. 2022) ("[C]ommunications that are private rather than public do not engender a closely analogous invasion of privacy.").  Pileggi alleges only that Facebook's computers learned information, not that it was disclosed publicly.  *See* Compl. ¶¶ 21, 50-51, 57.[2]

Pileggi also analogizes her injury (at 12-13) to one associated with the tort of "intrusion upon seclusion."  *TransUnion*, 141 S. Ct. at 2204.  While other courts have done the same,[3] none addressed the effect of a website's privacy policy disclosures on such an alleged injury.  Where, as here, a plaintiff "does not allege that Defendants' [purportedly intrusive] conduct violated Defendants' privacy policies," she has not alleged the type of "sufficiently offensive conduct" that this tort requires.  *Manigault-Johnson v. Google, LLC*, 2019 WL 3006646, at *6 (D.S.C. Mar. 31, 2019).  Or, as a Montana federal court put it:

> [A]n essential element of the tort of intrusion upon seclusion is that the plaintiff have an objectively reasonable expectation of privacy and there is no reasonable expectation of privacy when a plaintiff has been notified that his Internet activity may be forwarded to a third party to target him with advertisements.

---

[1] Despite having alleged that the Washington Examiner disclosed that she "watched . . . controversial [videos] . . . unpopular [with] . . . liberal[s]," Compl. ¶ 18, Pileggi disclaims reputational harm as a basis for standing.  *See* Opp. at 12 ("Washington Examiner misreads Ms. Pileggi's allegations of invasion of privacy as allegations that her reputation was harmed.").

[2] Pileggi does not allege (or even assert) that her Facebook page lacks the information she alleges the Washington Examiner disclosed.  Yet "the common law would recognize no invasion-of-privacy claim for giving additional publicity to something a person has already made public." *Crane v. Am. Bar Ass'n*, 2023 WL 2603191, at *5 (E.D. Mich. Mar. 22, 2023).

[3] *See Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017); *Feldman v. Star Trib. Media Co.*, 2023 WL 2388381, at *4 (D. Minn. Mar. 7, 2023).

3

*Deering v. CenturyTel, Inc.*, 2011 WL 1842859, at *2 (D. Mont. May 16, 2011).  Pileggi ignores *Manigault-Johnson* in her reply and added no allegations about the Washington Examiner's Privacy Policies to her Complaint:  she does not allege she was unaware of them, that the Washington Examiner's alleged conduct conflicted with their terms, or that she attempted to express her lack of consent by exercising the opt-out rights those policies describe.[4]

Instead, Pileggi urges the court (at 8) not to take judicial notice of those policies.  But it "is common for courts to take judicial notice of a company's historical privacy policies." *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1031 (N.D. Cal. 2020) (citing cases).  That is because the privacy policies "appear on publicly available websites and are thus proper subjects for judicial notice." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1061 (N.D. Cal. 2021).  The *Brown* court took judicial notice of, among 14 other historical versions, "Google's Privacy Policy in effect between March 31, 2020 and July 1, 2020." *Id.*  The Washington Examiner's Privacy Policies similarly state their effective dates on their face,[5] so those dates are subject to judicial notice.  Because the paragraphs of the Reen Declaration that discuss the Privacy Policies simply repeat those judicially noticeable facts,[6] there is no need for Pileggi to depose Reen before the Court relies on those facts.  *See* Opp. at 8.

The Washington Examiner's request that the Court take judicial notice of the public web pages containing its historical Privacy Policies is thus nothing like the federal government's "halfhearted[ ] suggest[ion]" that the Court take judicial notice of who sponsored or requested certain "demonstrations." *Mahoney v. United States Capitol Police Bd.*, 566 F. Supp. 3d 1, 15

---

[4] The Washington Examiner raised the same standing argument, relying on the same Privacy Policies, in its motion to dismiss the original complaint.  *See* ECF No. 19, at 8-12.

[5] *See*, *e.g.*, Reen Decl. Ex. A at 1 ("Revised December 22, 2022 and effective January 1, 2023.").

[6] *See* Reen Decl. ¶¶ 2-8.

4

(D.D.C. 2022). And *Harris*, which Pileggi also cites (at 8), did not involve a request to take judicial notice of privacy policies, but to "tak[e] judicial notice of whatever the Court sees" when it "navigat[es] to the video described in the complaint." *Harris v. Pub. Broad. Serv.*, 2023 WL 2583118, at *6 (N.D. Ga. Mar. 20, 2023).

Pileggi's other attempts (at 8-11) to claim a concrete injury lack merit. The Privacy Policies need not form a binding contract to nullify an asserted intrusion upon seclusion injury. What matters is that they "notified" Pileggi that her "Internet activity may be forwarded to a third party to target [her] with advertisements," which negates the "objectively reasonable expectation of privacy" necessary for such an injury. *Deering*, 2011 WL 1842859, at *2. And the failure to exercise opt-out rights is a recognized form of consenting to the disclosure of personal information.[7] Nor does Congress's decision to enact the VPPA's unique consent provision suffice to turn a statutory violation into a concrete injury. While courts must "afford due respect" to Congress's decision as Pileggi notes, Opp. at 11 (quoting *TransUnion*, 141 S. Ct. at 2204), Congress's decisions "do[] not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III;" *TransUnion*, 141 S. Ct. at 2205. Like the plaintiff in *Wheeler*, Pileggi has suffered none.[8]

The Court can also dispose quickly of Pileggi's remaining standing points. First, she cites only two standing cases involving the VPPA that post-date *TransUnion*. One is *Feldman*,

---

[7] *See U.S. W., Inc. v. FCC*, 182 F.3d 1224, 1239 (10th Cir. 1999) (rejecting FCC regulations requiring telephone companies to obtain opt-in approval from customers to share Customer Proprietary Network Information because the agency had not "show[n] that an opt-out strategy would not sufficiently protect customer privacy").

[8] Contrary to Pileggi's claim (at 13), this Court did not find that Wheeler lacked standing because she continued to purchase the defendant's product after learning of the statutory violation. The Court found the injuries suffered from the claimed "statutory violations of D.C. and federal law" were "too abstract" because they bore no "close relationship to harms traditionally recognized." *Wheeler*, 2022 WL 17039208, at *6-7.

5

which as discussed above did not consider the website's privacy policies. In the other, the defendant's only standing challenge was a (successful) merits argument, as we noted (Mot. at 12) and Pileggi does not dispute. Second, Pileggi's footnote (at 13 n.2) about her claims of economic injury does not confront the many cases rejecting claims of concrete injury from a website's monetization of data through targeted advertising. *See* Mot. at 11.[9] Third, Pileggi misreads (at 13-14) our self-inflicted harm argument. The only purported harm we identified as self-inflicted was her alleged decision to cease visiting the Washington Examiner's website. *See* Mot. at 12. But Pileggi is not relying on that decision to satisfy her burden to allege she suffered an injury in fact.

**II.     Pileggi's Allegations Do Not Plead a Violation of the VPPA for Multiple, Independent Reasons**

   **A.     Pileggi's Allegation that the Washington Examiner Disclosed the URL of Web Pages Fails To Plead a VPPA Violation**

Pileggi does not dispute that she alleges only that the Washington Examiner disclosed to Facebook "the internet addresses or uni[form] resource locators ('URLs') of the pages she had visited." Compl. ¶ 21. As the *Martin* court correctly held, that disclosure tells Facebook that Pileggi visited a web page, but does not disclose whether Pileggi "'requested or obtained' any videos at all, or instead merely read an article on the webpage." *Martin v. Meredith Corp.*, 2023 WL 2118074, at *3 (S.D.N.Y. Feb. 17, 2023).[10]

---

[9] The one case Pileggi distinguishes did not involve such data monetization and, in the portion she discusses, addressed the allegations necessary for standing to bring an unjust enrichment claim. *See Krukas v. AARP, Inc.*, 2021 WL 5083443, at *11 (D.D.C. Nov. 2, 2021). Pileggi has not pleaded such a claim.

[10] While we indicated in our motion to dismiss that an appeal was pending, the parties had already jointly stipulated to the withdrawal of the appeal with prejudice. *See* Stipulation, *Martin v. Meredith Corp.*, No. 23-412 (2d Cir. filed May 16, 2023, docketed May 24, 2023).

Pileggi disputes that conclusion (at 14-15), noting her allegations that the Washington Examiner's URLs included the word video and the title of the video on the web page. But as we showed, the same is true of the Google Play store's web page for Top Gun: the URL contains the word "movies" and the film's name. *See* Mot. at 15. Disclosing that a person visited that URL does not reveal what happened next: whether she clicked either the Buy or Rent button to request and — absent an internet error — obtain that movie, or merely read the "About this movie" text and continued to other web pages. Pileggi similarly does not allege that the Washington Examiner disclosed to Facebook anything that happened *after* she reached the web page, including whether the video on the page was set to play automatically or if it did play. But that extra allegation is necessary, as the *Martin* court held. "[E]ven for webpages including a video, sending the URL does not identify a person as having requested or obtained the video on that page." 2023 WL 2118074, at *4.

Finally, seizing on a passing reference in our motion, Pileggi suggests (at 15) we are arguing that she must allege disclosure that she viewed the videos to state a claim. Not so. Our argument — and *Martin*'s holding — is that the VPPA requires disclosure that a consumer intentionally requested or obtained a video, which disclosure of the URL of a web page does not provide. Pileggi does not dispute that the ordinary, contemporaneous meaning of "requested" and "obtained" includes an intent element. *See* Mot. at 15-16 (quoting dictionary definitions). Nor does she deny that Blockbuster was free to disclose that a person walked into its store and stood in front of a Top Gun display while the movie played on a nearby in-store television. But that is the most she has alleged. As *Martin* correctly held, that is not enough.

### B. Pileggi's Allegation that She Received a Free Email Newsletter that Did Not Provide Increased Access to Website Videos Does Not Make Her a Consumer Under the VPPA

#### 1. Pileggi Alleges No Nexus Between the Email Newsletters and the Videos She Could Request or Obtain on the Washington Examiner's Website

As in *Carter*, Pileggi's allegations "are directed to videos accessed through a web browser," yet she does not "plausibly allege that [her] status as a newsletter subscriber[] was a condition to accessing the site's videos, or that it enhanced or in any way affected [her] viewing experience." *Carter v. Scripps Networks, LLC*, 2023 WL 3061858, at *5-6 (S.D.N.Y. Apr. 24, 2023). Instead, Pileggi was "free to watch or not watch [washingtonexaminer.com] videos . . . no different" from any other website visitor. *Id.* at *6. Therefore, like the plaintiffs in *Carter*, Pileggi "does not plausibly allege that [she] acted as [a] 'subscriber[]' when [she] viewed videos on [washingtonexaminer.com]" and her "claim [should] be dismissed." *Id.* at *7.[11]

While Pileggi disputes that conclusion, she does not dispute *Carter*'s interpretation of "goods or services" in 18 U.S.C. § 2710(a)(1).[12] But her efforts to satisfy *Carter* fail. While she notes (at 19) that her Complaint alleges that the Washington Examiner's newsletters included embedded videos, she (like the *Carter* plaintiffs) does not allege that she "watched videos embedded in the newsletters themselves." *Carter*, 2023 WL 3061858, at *6. Instead, all the alleged VPPA violations occurred when she visited web pages containing videos. *See* Mot. at 17 (citing Complaint). Nor does her argument (at 19-20) that "video is central to the Washington

---

[11] The plaintiffs in *Carter* did not appeal the dismissal with prejudice of their complaint.

[12] She does not, for example, endorse reading that phrase "to encompass 'all parts of the economic output of society.'" *Lebakken v. WebMD LLC*, 2022 WL 16716151, at *3 (N.D. Ga. Nov. 4, 2022). And *Carter*'s identification of the absurd results that the *Lebakken* reading yields are not hypothetical. A recent complaint alleges that a person who "has eaten and enjoyed Hershey's" chocolate bars is "a 'purchaser' and a 'consumer' under the VPPA" when watching videos on Hershey's website. Compl. ¶ 38, *Rodriguez v. The Hershey Co.*, No. 23-cv-398-BEN-DEB (Mar. 2, 2023), https://bit.ly/45JjHCt.

Examiner's website and business" change things.  Again, as in *Carter*, she makes no allegation that "a newsletter subscription . . . gave [her] extra benefits as [a] viewer[ ]" denied to others who visited the Washington Examiner's website without having signed up to receive the emails.  *Carter*, 2023 WL 3061858, at *6.  She is not entitled to "video-streaming privacy protections not extended to otherwise-similar site visitors."  *Id.* at *5.

Finally, neither case Pileggi cites (at 20) supports a contrary result.  In *Harris*, the plaintiff alleged that she was a subscriber because she had "established an account with [PBS's] webpage," which "gave her access to video content."  2023 WL 2583118, at *3-4.  Pileggi does not allege that she established an account or that she took any action that gave her privileged access to access the videos that she alleges the Washington Examiner disclosed in violation of the VPPA.  The other case she cites did not involve the meaning of "goods or services."  Instead, that court identified a need for factual development about how much of Fandango's business is "selling movie tickets" versus "deliver[ing] video clips for at-home consumption" to determine whether downloading Fandango's smartphone application satisfied the Eleventh Circuit's multi-factor test for "an ongoing relationship" that makes a person a subscriber.  *Goldstein v. Fandango Media, LLC*, 2023 WL 3025111, at *4 (S.D. Fla. Mar. 7, 2023).[13]  Here, in contrast, the face of the Complaint shows that Pileggi has not alleged that signing up for a newsletter gave her special access to videos on the Washington Examiner's website.  Her Complaint fails for the same reasons as in *Carter*.

2. *Only paying customers are consumers*

Properly interpreted, "subscriber" in the VPPA — no different from "renter" and "purchaser" — requires a person to pay money to a video tape service provider.  That is the

---

[13] As we have explained (Mot. at 18-21), and discuss further below, that multi-factor approach misinterprets the word "subscriber" in the VPPA.

contemporaneous meaning of each word, as well as of "consumer," the statutory category to which each belongs. And it is confirmed by Congress's use of the four words in combination, as well as the 1984 law protecting the privacy of cable television viewing habits, where Congress used "subscriber" to refer to paying customers. *See* Mot. at 18-19.

In arguing that signing up for a free email newsletter makes her a subscriber under the VPPA, Pileggi addresses none of this. Instead, she notes (at 17) that other courts — in decisions that do not bind this Court — have disagreed. She recites the First Circuit's reasoning in *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482 (1st Cir. 2016), without addressing any of the errors we identified. Those include the erroneous assumption that paid subscription options did not exist in 1988 (they did); the use of a 2000 dictionary (not one from 1988); and the invention of congressional concern with introductory enticements (which are also not subscriptions). *See* Mot. at 21 & n.31. She cites (at 17) two other rulings that relied only on Congress's use of "subscriber," rather than "paid subscriber." *See Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *8 (N.D. Cal. Aug. 10, 2012). But the Supreme Court has held that an explicit modifier is not necessary where, as here, it is implicit in the term. *See* Mot. at 20. Those courts also ignored that Congress used "subscriber" (with no modifier) in the 1984 cable privacy law — and many others — to mean paying customer.[14]

Today, the colloquial use of "subscribe" includes signing up for free Substack email newsletters or notifications of new episodes of a free podcast. So it is no surprise that a 2021

---

[14] *See, e.g.*, 47 U.S.C. § 228(c)(4) (prohibition on common carriers, which provide service "for a fee," *id.* § 153(51), (53), from "disconnect[ing] . . . a subscriber's . . . telephone service"); 17 U.S.C. § 111(c)-(d) (creating a statutory license for a cable company to make secondary transmissions of copyrighted programming "to its subscribers").

Washington Examiner document used "subscriber" to refer to recipients of its free email newsletters. *See* Compl. ¶ 68; Opp. at 18. But Congress enacted the VPPA in 1988, not 2021. "Dictionaries from the era of [the statute's] enactment," *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014), make clear that "subscriber" — like "renter," "purchaser," and "consumer" — refers only to paying customers. Because Pileggi does not allege that she paid a subscription fee to the Washington Examiner, she is not a consumer under the VPPA.

### C. Pileggi Does Not Allege that the Washington Examiner Knowingly Disclosed a Consumer's Information

A defendant violates the VPPA only if it knows three things: (1) that it is "disclos[ing]" information to another "person," (2) that the information is "personally identifiable information," and (3) that the information "concern[s] a[ ] consumer." 18 U.S.C. § 2710(b)(1); *see* Mot. at 22. Pileggi does not allege that, when the Washington Examiner allegedly disclosed her personally identifiable information to Facebook, it knew that third piece of information: that it was disclosing information that concerned a consumer, rather than a non-consumer website visitor. Indeed, she does not even allege circumstantial evidence from which it can be inferred that the Washington Examiner *could have* known that fact at the time of those disclosures.

That makes this case different from Pileggi's direct-mail example. *See* Opp. at 22. A company knows its employees and their mailing addresses. When a company mails a pamphlet to all its investors, it knows — or could easily determine by comparing lists of names and addresses — which of its investors are employee shareholders. But Pileggi does not allege that the Washington Examiner had any way of distinguishing between disclosures the VPPA permits — because they pertain to non-consumers — and those she alleges the VPPA prohibits.

Pileggi responds that it is sufficient that she alleged that the Washington Examiner knew that *some* disclosures would concern consumers, even if it did not know *which* ones. *See id.* But

11

that kind of knowledge — which could be called "potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal" — is not actual knowledge, which the VPPA requires. *Intel Corp. Inv. Pol'y Comm. v. Sulyman*, 140 S. Ct. 768, 776 (2020); *see In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015). Courts have rejected similar attempts to use such "generalized knowledge" to satisfy an actual-knowledge standard in analogous contexts. *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 311 (4th Cir. 2018) (rejecting the argument that Cox's knowledge that "*some number of its subscribers* were infringing BMG's copyrights" — rather than knowledge of "*which ones* were infringing" — satisfied the knowledge requirement for contributory copyright infringement). Here, too, Pileggi has alleged no more than generalized knowledge.

Pileggi cites (at 21) multiple district court decisions rejecting arguments that other plaintiffs inadequately alleged the knowledge element of a VPPA violation. But in each case, the defendant argued only that the plaintiff had failed to allege the first two knowledge elements. *See* Mot. at 23 n.32. Pileggi agrees that we are "advanc[ing] a novel argument" that the defendants in those other cases did not raise. Opp. at 21. But her assertion that "[n]othing in the statute" requires her to allege knowledge of the third element, *id.*, ignores that, "[a]s a matter of ordinary English grammar," the "statute's word 'knowingly' . . . appl[ies] to all the subsequently listed elements," *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). The statute, therefore, requires Pileggi to allege that the Washington Examiner knew its alleged disclosures "concern[ed] a[ ] consumer." Her failure to do so provides another, independent basis to dismiss her complaint.

### D. The News Clips Pileggi Alleges the Washington Examiner Posts Are Not Similar to Prerecorded Video Cassette Tapes

Congress applied the VPPA to entities "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or *similar* audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added). Pileggi argues (at 24) that the word "similar" serves only to exclude live broadcasts and audio recordings. But if that is all Congress meant, it would have drafted the statute to encompass "prerecorded video cassette tapes or *any other prerecorded* audio visual materials." As the Eighth Circuit recognized, when Congress uses "the comparative term 'similar,'" rather than "any other . . . or simply other[]," Congress intends to capture only "'comparable' or 'nearly corresponding'" matters. *United States v. Stanko*, 491 F.3d 408, 414 (8th Cir. 2007); *see also Reyes v. Sessions*, 342 F. Supp. 3d 141, 151 (D.D.C. 2018) (following *Stanko*).

Pileggi says nothing about *Stanko*. Pileggi also does not contend that the news clips that Pileggi alleges appear on the Washington Examiner's website are comparable or nearly corresponding to the movies, television shows, and other long-form videos that video stores made available to consumers in various formats in 1988. Instead, she asserts (at 23) that the comparisons are too difficult. But courts must make much tougher historical comparisons. *See Hanson v. Dist. of Columbia*, 2023 WL 3019777, at *12-17 (D.D.C. Apr. 20, 2023) (applying the historical analogical reasoning the Supreme Court's *Bruen* decision requires). And the comparison here is easy: the short news video the Complaint identifies is unlike a full-length 60 Minutes episode or even a 50-minute compilation of NBC News stories from the 1980s.[15]

---

[15] Both were available on VHS tapes released in 1992 and 1990, respectively, and were recently offered on eBay. *See* https://perma.cc/T94P-5E4F (60 Minutes episode); https://perma.cc/Y7XR-XUK8 (NBC News 1980s compilation).

13

Finally, Pileggi's reliance (at 22-23) on *In re Hulu Privacy Litigation* is misplaced. That court rejected Hulu's argument that the VPPA applies only to physical media, not to videos streamed over the internet. 2012 WL 3282960, at *4-6. But prerecorded movies and television shows, which Hulu made available to its paying customers, were also on the VHS tapes in video stores in 1988. Giving "similar" its ordinary meaning thus "ensure[s] that [the] VPPA's protections would retain their force even as technologies [for in-home movie and television viewing] evolve." *Id.* at *6. But Pileggi's argument (at 23) that the popularity of short-form videos today supports expanding the VPPA to cover *all* prerecorded videos reads "similar" out of the statute and wrests the VPPA from its historical moorings.

### III. The Court Should Dismiss the First Amended Complaint with Prejudice

Pileggi concludes with a passing request (at 24 n.6) for leave to amend. Under D.C. Circuit precedent and this Court's local rules, requests for leave to amend require a motion and a copy of the proposed pleading. *See Hudson v. Am. Fed. of Gov't Emps.*, 308 F. Supp. 3d 388, 395 (D.D.C. 2018). A footnote is insufficient.

In any event, the sole case Pileggi cites in that footnote is not on point. There, the plaintiff — which had amended its complaint before the defendant moved to dismiss — sought leave to amend again after seeing the motion to dismiss. The plaintiff did so by motion, attaching the proposed second amended complaint.[16] The district court found that "the interests of justice demand" the plaintiff receive that opportunity. *Bancroft Glob. Dev. v. Koskinen*, 2017 WL 11579467, at *2 (D.D.C. Oct. 27, 2017). Pileggi already had (and took) that opportunity, having amended her complaint after seeing the Washington Examiner's motion to dismiss. *See* ECF Nos. 19, 20.

---

[16] *See* Motion To Amend/Correct Complaint, *Bancroft Glob. Dev. v. Koskinen*, No. 17-cv-395-RC (D.D.C. July 28, 2017).

14

Dismissal with prejudice is proper here, as it was in *Martin* and *Carter*, because Pileggi's First Amended Complaint suffers from legal flaws that she "could not possibly cure . . . by alleging new or additional facts." *Wilson v. On the Rise Enters., LLC*, 305 F. Supp. 3d 5, 12 (D.D.C. 2018).  But if the Court concludes that such a possibility exists despite its grounds for dismissal, it should direct Pileggi to comply with Local Civil Rules 7(i) and 15.1, and file a motion for leave attaching a proposed Second Amended Complaint for the Court to evaluate.

## CONCLUSION

The Court should grant the Washington Examiner's Motion and dismiss the First Amended Complaint with prejudice.

Respectfully submitted,

*/s/ Scott H. Angstreich*
Mark C. Hansen (D.C. Bar No. 425930)
Scott H. Angstreich (D.C. Bar No. 471085)
Grace W. Knofczynski (D.C. Bar No. 1500407)
Eden M. Bernstein (D.C. Bar No. 1780538)
KELLOGG, HANSEN, TODD,
 FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Fax: (202) 326-7999
mhansen@kellogghansen.com
sangstreich@kellogghansen.com
gknofczynski@kellogghansen.com
ebernstein@kellogghansen.com

*Counsel for Defendant The Washington Newspaper Publishing Company, LLC*

June 9, 2023

15

**CERTIFICATE OF SERVICE**

I, Scott H. Angstreich, hereby certify that this document, Defendant's Reply Memorandum in Support of Its Motion to Dismiss Plaintiff's First Amended Complaint and Proposed Order, was filed electronically on the 9th day of June, 2023, using the CM/ECF system and will be sent electronically to any registered participant as identified on the Notice of Electronic Filing (NEF).

> */s/ Scott H. Angstreich*
> Scott H. Angstreich