# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL SALAZAR,                     )
*individually and on behalf of all others*     )
*similarly situated*,                      )
                                     )          NO. 3:22-cv-00756
          Plaintiff,                 )          JUDGE RICHARDSON
                                     )
v.                                   )
                                     )
PARAMOUNT GLOBAL d/b/a/              )
247SPORTS,                           )

          Defendant.

## <u>MEMORANDUM OPINON AND ORDER</u>

Plaintiff, Michael Salazar, has filed a putative class action complaint against Defendant,

Paramount Global d/b/a/ 247Sports, alleging a violation of the Video Privacy Protection Act

("VPPA"). (Doc. No. 1). Defendant has moved to dismiss the complaint for lack of subject-matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and on the grounds that the complaint

fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure

12(b)(6). (Doc. No. 16, "Motion"). Plaintiff filed a response (Doc. No. 24), and Defendant filed a

reply (Doc. No. 26). For the reasons stated herein, Defendant's request to dismiss the complaint

under Rule 12(b)(1) will be denied, and Defendant's request for dismissal under Rule 12(b)(6) will

be granted.

<u>BACKGROUND</u>[1]

This case is a putative class action, in which Plaintiff[2] alleges that Defendant Paramount Global, through its ownership of 247Sports.com, has violated the Video Protection Privacy Act ("VPPA"). (Doc. No. 1). Via the Motion, Defendant now moves to dismiss the complaint on the grounds that: (i) the Court lacks subject-matter jurisdiction because (according to Defendant) Plaintiff lacks Article III standing; and (ii) the complaint fails to state a claim under the VPPA.

Plaintiff's claim revolves around his activity on a website named "247Sports.com." Strangely, the complaint does not explain what type of website 247Sports.com is. Defendant claims in its memorandum in support of the Motion that "247Sports.com is 'the industry leader in recruiting content' for college sports, delivering team-specific news through 'online news feeds, social platforms, daily newsletters, podcasts, vibrant communities, text alerts and mobile apps.'" (Doc.   No.   17   at   5[3]   (quoting   *About   247Sports*,   247Sports.com, https://247sports.com/Article/About-247Sports-116092/.)).[4]

---

[1] Most of the facts contained in this section are taken from the complaint at Doc. No. 1. As noted below, where the complaint is entirely unclear as to the meaning of terms contained in the complaint, the Court is forced to rely on details provided in the parties' briefs. The Court takes the facts contained in this section as true for the purposes of Defendant's argument that the complaint should be dismissed under Rule 12(b)(6). However, the Court does not take as true any such facts for purposes of Defendant's argument that the complaint should be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1).

[2] By "Plaintiff," the Court refers to Michael Salazar, who is currently the lead plaintiff in this action.

[3] When citing herein to a page in a document filed by one of the parties, it endeavors to cite to the page number ("Page — of —") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

[4] As noted above, despite repeatedly citing to 247Sports.com in the complaint, Plaintiff does not provide any background information about 247Sports.com that would provide helpful context for the allegations contained in the complaint and the arguments raised by the parties. Generally, a court must rely on the facts contained in the four-corners of the complaint in resolving a motion to dismiss. However, the Sixth Circuit has recognized that "if extrinsic materials merely fill in the contours and details of a complaint, they add nothing new and may be considered without converting the motion to one for summary judgment." *See*

To register for 247Sports.com,[5] an individual signs up for an online newsletter by providing personal information, including but not limited to an email address. (Doc. No. 1 at 6). Herein after, the Court refers to those individuals who sign up for 247Sports.com's online newsletter as "digital subscribers."[6] All digital subscribers provide Defendant with their IP address also. (*Id.* at 7). Those who subscribe have access to a variety of 247Sports.com video media that is available on the website. (*Id.*).[7]

Defendant installed on 247Sports.com the Facebook[8] tracking pixel ("Facebook pixel"), which is a code that allows Facebook to collect the data of digital subscribers to 247Sports.com

---

*Armengau v. Cline*, 7 F. App'x 336, 345 (6th Cir. 2001). Insofar as the Court relies on aspects of 247Sports.com not discussed in the complaint, it does so only to "fill in the contours and details" of the complaint. *See id.*

[5] The Court notes that the complaint is not clear as to what it means when it refers to "register[ing]" for 247Sports.com or to Plaintiff being a "digital subscriber." The complaint does not suggest that to become a "digital subscriber," Plaintiff did anything more than subscribe to 247Sports.com's newsletter. Furthermore, the complaint does not suggest that an individual can access 247Sports.com's content only by registering or signing up for the newsletter. Instead, the complaint suggests—without spelling it out explicitly—that all of 247Sports.com's content (meaning content on the website) is available to all individuals regardless of whether they "register," sign up for the newsletter, or otherwise complete some type of sign-up process. Therefore, the Court interprets "digital subscriber" as contained in the complaint to mean an individual who registers or signs up for 247Sports.com's newsletter.

This reading of the complaint is supported by the parties' briefs. (Doc. No. 24 at 8 ("Plaintiff Michael Salazar was a 247's [sic] newsletter subscriber and, during that time, was also a Facebook user [*i.e.*, digital subscriber].")), 13 ("As part of his subscription, [Plaintiff] receives emails and other communications from 247Sports.com."); (Doc. No. 17 at 5–6 ("[W]ebsite visitors can watch videos on 247Sports.com regardless of whether they sign up for the Newsletter.")). Therefore, the Court construes the facts in the complaint to mean that all individuals may view 247Sports.com's content, irrespective of whether they have not chosen to subscribe to the newsletter by "registering" or signing up for the newsletter.

[6] The Court notes that the parties should be conscious of the importance of clarity regarding the (alleged) facts in the complaint.

[7] As indicated below, the complaint makes no effort to define "digital subscribers" or elucidate the distinctions (if any exist) between those individuals who register for the newsletter versus those individuals who are digital subscribers. The complaint also uses the term "user" and "digital subscriber" interchangeably. The Court herein uses the term "digital scriber" in lieu of "user" for consistency.

[8] As Facebook is a popular social media website (as likely would be known by anyone who knows what a "social media website" is).

who also have a Facebook account. (*Id.* at 2). The Facebook pixel discloses to Facebook the digital subscribers' viewed video media including a subscribers' Facebook ID ("FID"). (*Id.*). An FID identifies a digital subscriber's Facebook account. (*Id.*).

If a digital subscriber of 247Sports.com is logged into his or her Facebook account[9] while watching video content on 247Sports.com, then 247Sports.com sends to Facebook (through the Facebook pixel) the video content name, its URL, and, most notably, the digital subscriber's Facebook ID. (*Id.* at 9).

Plaintiff, Michael Salazar, has been a digital subscriber of 247Sports.com from 2022 to present (which the Court infers means that Plaintiff began subscribing to 247Sports.com's newsletter in 2022). (*Id.* at 13). Plaintiff became a digital subscriber of 247Sports.com by providing, among other information, his email address and IP address, as well as any cookies associated with his device. (*Id.*). Plaintiff has had a Facebook account since approximately 2021. (*Id.*). As part of his subscription, Plaintiff receives emails and other communications from 247Sports.com. (*Id.*). Curiously, Plaintiff does not allege that he has in fact accessed any video content from 247Sports.com.

The complaint, filed by Plaintiff on behalf of himself and others who are similarly situated, contains a single claim for relief.[10] *(Id.* at 15). Plaintiff alleges that Defendant violated the Video

---

[9] The complaint lacks clarity as to whether a digital subscriber must be logged-in to his or her Facebook account in order for the Facebook pixel to transmit personally identifying information to Facebook. But the complaint does allege that "[d]uring the relevant time period [Plaintiff] has used his 247Sports.com digital subscription to view Video Media through 247Sports.com and/or App while logged into his Facebook account. By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein." (Doc. No. 1 at 4). From these allegations, the Court finds it reasonable to infer that a digital subscriber must in fact be so logged-in for the Facebook pixel to make the referenced transmission.

[10] Plaintiff should be commended for conciseness and clarity as to the number and nature of his causes of action.

Protection Privacy Act ("VPPA") when it installed the Facebook pixel, which in turn has led to the disclosure to Facebook of Plaintiff's personally identifying information. (*Id.* at 16).

As noted, Defendant has moved to dismiss the complaint under Rule 12(b)(1) based on a purported lack of subject-matter jurisdiction and, alternatively, under Rule 12(b)(2) based on Plaintiff's alleged failure to state a claim. (Doc. No. 16). The Court cannot grant a Rule 12(b)(6) motion, even if it were otherwise inclined to do so, unless it has subject-matter jurisdiction, and so the Court will address the Rule 12(b)(1) motion first. *See Prop. Mgmt. Connection, LLC v. Consumer Fin. Prot. Bureau*, No. 3:21-CV-00359, 2021 WL 5282075, at *4 (M.D. Tenn. Nov. 10, 2021) (noting that when confronted with these two alternative motions, "the Court must start with an analysis of subject-matter jurisdiction pursuant to 12(b)(1), because if a court does not have subject-matter jurisdiction, any 12(b)(6) defense (of failure to state a claim) would become moot if the court lacks subject-matter jurisdiction in the first place").

LEGAL STANDARD

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject-matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). "The presumption of correctness that we accord to a complaint's allegations falls away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question. At that point, a court need not close its eyes to demonstrated jurisdictional deficiencies in a plaintiff's case and accord a plaintiff's unproven allegations greater weight than

substantive evidence to the contrary." *Commodity Trend Service, Inc. v. Commodity Futures Trading Com'n*, 149 F.3d 679, 685 (7th Cir. 1998).

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or

"bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## DISCUSSION

"The VPPA prohibits a 'video tape service provider' from 'knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider.'" *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015) (quoting 18 U.S.C. § 2710(b)(1)). "Its impetus was the publication in a weekly newspaper in Washington of a profile of Judge Robert

H. Bork based on the titles of 146 films his family had rented from a video store." *Id.* (internal quotations marks omitted).

Under the VPPA, a "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *See* 18 U.S.C. § 2710(a)(1). A "video tape service provider" is any person "engaged in the business" of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ." *See id.* at § 2710(a)(4).[11] Finally, "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *See id.* § 2710(a)(3).

Defendant seeks dismissal on several grounds. First, Defendant argues that the complaint should be dismissed under Rule 12(b)(1) because Plaintiff lacks standing. Second, Defendant argues that the complaint should be dismissed under Rule 12(b)(6) because the complaint fails to state a claim upon which relief can be granted. Specifically, Defendant argues that the complaint does not plausibly allege that (1) 247Sports.com is a "video tape service provider," (2) Plaintiff is a "consumer" (and therefore, in turn, a "subscriber"); (3) the newsletters are "goods" or "services"; (4) Defendant itself disclosed identifying information; and (5) Defendant knowingly disclosed such information.

Defendant's request for dismissal under 12(b)(1) will be denied because the Court finds that Plaintiff has standing. However, Defendant's request for dismissal under 12(b)(6) will be

---

[11] The definition of "video tape service provider" also includes "any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure." The parties do not contend that this portion of the definition is relevant to this action.

granted because the Court finds that the complaint does not plausibly allege that Plaintiff is a "subscriber of goods or services from a video tape service provider" under the VPPA.

## 1. Plaintiff Has Standing for His VPPA Claim[12]

Defendant argues that Plaintiff does not have standing because (according to Defendant) Plaintiff has failed to adequately allege either a concrete injury in fact or the traceability of the injury to Defendant's conduct. "To satisfy Article III's standing requirements, a plaintiff must show: "(1) [he] has suffered an 'injury-in-fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Soehnlen v. Fleet Owners Insurance Fund*, 844 F.3d 576, 581 (6th Cir. 2016) (internal quotation marks omitted).

Though not addressed by Defendant, there are two ways to challenge subject-matter jurisdiction: facial and factual attacks. *Gentek Bldg. Products, Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack questions merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. *Id.* If those allegations establish federally-cognizable claims, jurisdiction exists. *Id.* A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. *Id.*

---

[12] Courts should resolve the issue of standing even when a court believes that dismissal on alternative grounds is warranted. *See, e.g.*, *Halaburda v. Bauer Pub. Co., LP*, 12-CV-12831, 2013 WL 4012827, at *3 (E.D. Mich. Aug. 6, 2013); *Austin-Spearman v. AMC Network Entertainment LLC*, 98 F. Supp. 3d 662, 665 (S.D.N.Y. 2015) (resolving standing dispute before addressing argument that plaintiff failed to state a claim under the VPPA); *James v. Marshall*, 1-22-cv-241, 2022 WL 2809857, at *8 (S.D. Ala. Jul. 18, 2022) (resolving argument that the plaintiff did not have standing before determining whether the complaint failed to state a claim). This is because a lack of standing means that the court lacks subject-matter jurisdiction, in which case it typically should not even be addressing whether dismissal on alternative grounds is warranted; accordingly, the court should resolve the issue of standing (subject-matter jurisdiction) first, and then proceed to address the alternative grounds if (but only if) it concludes that it does have subject-matter jurisdiction.

Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. *See id.* "[T]he district court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction[.]" *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990). The Sixth Circuit has noted that:

> The factual attack, however, differs greatly [from a facial attack] for here the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. Pro. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 890 (3d Cir. 1977)). Notably, "the fact that the court takes evidence for the purpose of deciding the jurisdictional issue does not mean that factual findings are therefore binding in future proceedings." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

In making its decision, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts. *Gentek Bldg. Products, Inc.*, 491 F.3d at 330; *see also Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) ("In reviewing a 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits."). As always, the party invoking federal jurisdiction has the burden to prove that jurisdiction. *Global Technology, Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015); *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005).

With respect to whether Plaintiff has pled a concrete injury, Defendant makes a facial attack. In other words, Defendant argues that the facts alleged in the complaint do not demonstrate a concrete injury. However, with respect to the issue of traceability, Defendant makes a factual attack. That is, Defendant argues that based on the actual facts as they should be found by the Court, Plaintiff's alleged injury actually is not traceable to Defendant. The Court therefore applies the legal standard for a facial attack and a factual attack respectively below.

A. Concrete-Injury Requirement

Defendant argues that the alleged disclosure of Plaintiff's information to Facebook does not constitute a concrete injury. (Doc. No. 17 at 20). As Defendant points out, an intangible harm can suffice as a concrete injury for standing purposes if it has a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *See Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Defendant's argument that disclosure of information does not meet this standard misses the mark. The issue is not whether mere disclosure of information constitutes a concrete injury*,* but instead whether disclosure of *personally identifying information* to a third-party constitutes a concrete injury.

The court in *Austin-Spearman v. AMC Network Entertainment LLC*, 98 F. Supp. 3d 662 (S.D.N.Y. 2015), confronted an argument as to standing under the VPPA that was similar to the one now posed by Defendant. In *Austin-Spearman*, the defendant argued that the plaintiff lacked standing because he alleged only a violation of the VPPA as his injury and did not otherwise plead a "harm resulting from disclosure. . .." *See id.* at 666. The court was unpersuaded by this argument. As the court explained, Congress, via the VPPA, created "a right to privacy of one's video-watching history, the deprivation of which—through wrongful disclosure, or statutory violation,

alone—constitutes an injury sufficient to confer Article III standing."[13] *See id.* Therefore, the court found that, in light of the VPPA, the disclosure of this information constituted an injury for standing purposes, even if the plaintiff had not alleged a harm suffered beyond the disclosure. *See id.* And as the court noted, "every court to have addressed this question had reached the same conclusion, affirming that the VPPA establishes a privacy right sufficient to confer standing through its deprivation." *See id.* at 666–667 (collecting cases).

The reasoning of the court in *Austin-Spearman* is persuasive. The right created by the VPPA is not merely a right to not have information transmitted to third parties, as Defendant contends. It is instead a statutory right to have personally identifiable information remain private by proscribing disclosure of that information to third parties. *See id.* 666. Indeed, as the court in *Carter v. Scripps Networks, LLC*, 22-cv-2031, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023), recently explained, "disclosure of private information is a harm that courts have traditionally considered to be redressable." *Id.* at *3. And as the Third Circuit noted in a case in which the

---

[13] The alert reader may wonder whether such a holding survives the Supreme Court's subsequent decision in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ["*Spokeo 1*"], *as revised* (May 24, 2016). In *Spokeo,* Justice Alito's majority opinion explained:

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, Robins could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.

*Id.* at 341. Cases like *Austin-Spearman* are not saying that a plaintiff has standing merely by virtue of having alleged a violation of a statutory right created by Congress in a statute (here, the VPPA). They are saying that the violation of that statutory right entails the kind of injury that is sufficient to confer standing under Article III. So they are not inconsistent with *Spoke I.* The Court notes additionally that the majority opinion in *Spokeo* observed that "we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete." *Spokeo I,* 578 U.S. 330 at 340

plaintiffs sued under the VPPA, "[t]he purported injury here is clearly particularized, as each plaintiff complains about the disclosure of information relating to his or her online behavior. While perhaps 'intangible,' the harm is also concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016). More recently, the Ninth Circuit explained:

> [T]he VPPA identifies a substantive right to privacy that suffers any time a video service provider discloses otherwise private information. As a result, every 18 U.S.C. § 2710(b)(1) violation "present[s] the precise harm and infringe[s] the same privacy interests Congress sought to protect" by enacting the VPPA. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (so holding with respect to the Telephone Consumer Protection Act of 1991). Accordingly, *Spokeo I* and *Spokeo II* are distinguishable from this VPPA claim, and Plaintiff need not allege any further harm to have standing. *Id.* We therefore join the two other circuits that, after *Spokeo I*, have found Article III standing in similar cases arising under the VPPA. *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d [at 274].

*Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983–84 (9th Cir. 2017) (italics and footnote omitted).[14] The instant case is of the same ilk.

Although Defendant attempts to make hay out of the Supreme Court's decision in *Transunion* and the applicability of it to this case, Defendant somehow fails to reckon with the fact that in *TransUnion*, the "Supreme Court concluded that plaintiffs whose information was disclosed to a third party suffered a concrete harm, but plaintiffs whose negative information was never disclosed to a third party did not suffer a concrete harm and therefore lacked standing." *See id.* (citing *TransUnion*, 141 S. Ct. at 2209–13). The Court's finding in *Transunion* is therefore plainly supportive of Plaintiff's argument that he suffered a concrete harm when his personally identifiable information was disclosed to Facebook. Defendant's arguments that Plaintiff has not asserted a

---

[14] The reference to "*Spokeo II*" is a reference to the Ninth Circuit's opinion *Robins v. Spokeo, Inc.*, 867 F.3d 1108 (9th Cir. 2017), issued after the Supreme Court's post-*Spokeo I* remand of the case to the Ninth Circuit.

concrete injury in light of *Transunion* is thus unavailing. In summary, the Court finds that Plaintiff's allegation that his personally identifiable information was transmitted to Facebook in violation of the VPPA identifies a concrete harm for standing purposes.[15]

B. <u>Fairly Traceable Requirement</u>

Next, Defendant argues that Plaintiff does not have standing under Article III because (again, according to Defendant) his injury is not fairly traceable to Defendant's conduct. (Doc. No. 17 at 23). "At the pleading stage, the plaintiff's burden of alleging that [its] injury is fairly traceable to the defendant's challenged conduct is relatively modest[.]" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (internal quotation marks omitted). "Thus, harms that flow indirectly from the action in question can be said to be fairly traceable to that action for standing purposes." *Id.* (internal quotation marks omitted).

Defendant asserts that the complaint specifically identifies only the "c_user cookie" in alleging that [Plaintiff's] FID was disclosed to Facebook."[16] (Doc. Nos. 17 at 23, 26 at 12). Defendant explains that *Facebook* places this cookie on a digital subscriber's browser when he or she is logged in to his or her Facebook account. (Doc. No. 26 at 12). Defendant therefore argues that if Plaintiff had simply logged out of Facebook, the "c_user cookie" would not have transmitted

---

[15] Defendant's reliance on privacy torts to demonstrate that Plaintiff has not suffered a concrete injury is unpersuasive. *Transunion* plainly supports the conclusion that Plaintiff suffered a concrete injury when his personally identifiable information was purportedly transmitted to Facebook. The Court need not consider whether Plaintiff's injury would meet the standards of privacy torts as Defendant would have the Court do.

[16] Neither the complaint nor the parties' brief make clear the distinction between the Facebook Pixel and cookies such as the "c_user cookie." The complaint states that Defendant collects and shares the personal information with visitors to its website with third parties "through cookies, software development kits ('SDK'), and pixels." (Doc. No. 1 at 2). From this, the Court gleans that the "c_user cookie" is a method by which personally identifiable information is transmitted to Facebook that is separate from the Facebook pixel.

the personally identifiable information, and therefore it is *Plaintiff*'s actions that caused the injury rather than Defendant's. (Doc. No. 17 at 24).

Though Defendant does not characterize its argument on traceability as either "facial" or "factual," the Court construes the argument as "factual attack" on subject-matter jurisdiction. After all, Defendant does not argue that the allegations in the complaint are insufficient to meet the traceability requirement of Article III standing. Instead, Defendant challenges the truth (the factual veracity) of particular allegations in the complaint supporting the notion that Defendant's actions caused the alleged disclosure of Plaintiff's personally identifiable information to Facebook, which in turn could affect the Court's analysis of the traceability requirement.[17] It is true that a court, in assessing a factual attack, may "consider extrinsic evidence and, if disputed, weigh the evidence to determine whether the facts support subject matter jurisdiction without converting the motion to dismiss into a motion for summary judgment." *See Marquez v. ARCP UO Portfolio IV, LP*, cv-19-03851, 2019 WL 8105334 (C.D. Cal. Jul. 18, 2019). But Defendant has provided no extrinsic evidence in support of its factual claim in its Motion regarding the "c_user cookie." *See Jaiyeola v. Toyota Motor Corp.*, 1-17-cv-562, 2019 WL 8351525, at * 2 (W.D. Mich. Dec. 6, 2019) ("[S]tatements in a party's brief are not evidence.") (citing *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006)). In failing to either attack the sufficiency of the allegations in the complaint without resort to extrinsic evidence (*i.e.*, launching a facial attack) or providing a scintilla of extrinsic evidence in order to raise a factual controversy regarding an allegation in the complaint

---

[17] For example, the complaint states that the disclosure of a subscriber of 247sports.com's personally identifying information to Facebook is not the subscriber's "decision, but rather the result of Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into 247Sports.com's website or app." (Doc. No. 1 at 9).

(*i.e.*, launching a factual attack), Defendant has not properly raised any legally cognizable challenge as to the traceability requirement of Article III standing.[18]

Perhaps the Court could end its standing analysis here. But given that Defendant has drawn the Court's attention to a potential traceability problem, the Court feels compelled to satisfy itself that Plaintiff has alleged factual matter plausibly suggesting that his injury is fairly traceable to Defendant's conduct. *See Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it."). The complaint alleges that Defendant installed the Facebook pixel on 247Sports.com, which allowed the pixel to collect digital subscribers' data and transmit it to Facebook. (Doc. No. 1 at 2). This allegation is neither novel nor implausible. *See Czarnionka v. Epoch Times Assoc., Inc.*, 22 Civ. 6348, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022) ("By installing the Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within."). The complaint further states that "[t]his transmission is not the digital subscribers [sic] decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into 247Sports.com's website or App." (Doc. No. 1 at 9). The Court finds that these allegations are sufficient to fulfill the standing requirement that Plaintiff's injury be fairly traceable to Defendant's conduct.

---

[18] The Court cannot consider Defendant's bald factual assertion (Doc. No. 17 at 3, 24) that the "c_user cookie" is placed on the browser by Facebook and that it could be avoided by a digital subscriber if that subscriber logs out of Facebook. *See Jaiyeola v. Toyota Motor Corp.*, 1-17-cv-562, 2019 WL 8351525, at * 2 (W.D. Mich. Dec. 6, 2019) ("[S]tatements in a party's brief are not evidence.") (citing *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006)). Defendant also asserts that these facts are judicially noticeable and are incorporated by reference in the complaint. (Doc. No. 17 at 3, 24). Defendant does not point to a source containing these facts of which the Court could take judicial notice. The Court is also not persuaded that these facts are incorporated by reference in the complaint.

Therefore, the Court finds that Plaintiff has established a concrete injury that is fairly traceable to Defendant's conduct. Defendant does not challenge the redressability requirement, and the Court does not regard there be a basis on which to address this requirement *sua sponte*. The Court thus finds that Plaintiff has Article III standing.

**2. Plaintiff Has Failed to State a Claim under the VPPA Because He is Not a "subscriber of goods or services from a video tape service provider"[19]**

As explained above, Defendant asserts several grounds as to why Plaintiff has not stated a claim under the VPPA. The second is grounded in the fact that Plaintiff has no claim under the VPPA unless he is a "consumer," meaning "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *See* 18 U.S.C. § 2710(a)(1). Defendant asserts that Plaintiff is not a "consumer" within the meaning of the VPPA, because (according to Defendant)

---

[19] The Court acknowledges that although the Court determined that Plaintiff has failed to state a claim under the VPPA because he is not a "subscriber of goods or services from a video tape service provider," the Court alternatively could find a failure to state a claim were it to determine, more discretely, that Defendant's newsletters do not constitute "goods or services" within the meaning of the VPPA. A "video service tape provider" is liable under 18 U.S.C.§ 2710 (b)(1) only if it knowingly discloses personally identifiable information "concerning any *consumer*." *See* 18 U.S.C. § 2710(b)(1). An individual is a "consumer" under the VPPA only if he or she is a "renter, purchaser, or subscriber of goods or services from a video tape service provider." *See* 18 U.S.C. § 2710(a)(1). Therefore, if Defendant's newsletters— the only thing of which Plaintiff is a subscriber from Defendant—are not "goods" or "services," then Defendant cannot be held liable under this provision of the VPPA.

The Court declines to address whether that is the case, but it finds the liability under the VPPA is precluded because—even if Defendant's newsletters are "goods or services" within the meaning of the VPPA— Plaintiff nevertheless is not a "subscriber of goods or services from a video tape service provider" by virtue of having a subscription to the newsletter. This approach is consistent with the approach of the Court in *Carter*, which as discussed below, the Court finds persuasive. It is also noteworthy that a large part of Defendant's 12(b)(6) argument suggests that Plaintiff is not a "subscriber" under the VPPA because he is not a "subscriber of *goods or services* from a video tape service provider." (Doc. No. 17 at 11) (emphases added). The Court rejects this suggestion; a person may be a "subscriber" (to something, from someone) even if they are not a subscriber "of *goods or services from a video tape service provider*"—and what matters here is that Plaintiff (even assuming he is a "subscriber" to the newsletter by virtue of having signed up for it) is not "a subscriber *of goods or services from a video tape service provider*." Despite Defendant's unfortunate framing of the issue here, in substance its argument is not actually that Plaintiff is not a "subscriber" at all, but rather that he is not a subscriber *of goods or services from a video tape service provider*."

he is not a "subscriber of goods or services from a video tape service provider." Under this theory, Defendant would not be liable under the VPPA for its alleged conduct because the statute only protects individuals who are "consumers" under the statute.[20] *See id.* The Court agrees, and therefore it need not reach the additional grounds for dismissal under Rule 12(b)(6) set forth by Defendant.[21]

The court in *Carter v. Scripps Networks, LLC* recently resolved a motion to dismiss involving (alleged) facts materially indistinguishable from those presently before the Court. 2023 WL 3061858. In *Carter*, the plaintiffs filed a putative class action against HGTV for an alleged violation of the VPPA. *Id.* at *1. HGTV owned hgtv.com, which is a website that "hosts hundreds of videos featuring home and lifestyle content." *See id.* The plaintiffs each subscribed to hgtv.com's newsletter, and each plaintiff also had a Facebook account. *See id.* The complaint did not allege that the video content of hgtv.com was available only through subscription to the newsletter. *See id.* The plaintiffs alleged that HGTV transmitted personally identifiable information to Facebook through the Facebook pixel and the "c_user cookie." *See id.* The defendant moved to dismiss the complaint on the grounds that the plaintiffs lacked standing, and in the alternative, that they failed to state a claim. *See id.* at 2.

After finding that the plaintiffs had standing, the court turned to the issue of whether plaintiffs were "subscribers of goods or services from a video tape service provider" under the

---

[20] In the complaint, Defendant identifies himself as a "subscriber" under the VPPA but does not assert that he could be considered a "renter" or "purchaser." (Doc. No. 1 at 17). The Court therefore does not address whether Plaintiff could be considered a "renter " or "purchaser" (of goods or services from a video tape service provider) under the VPPA.

[21] For the purposes of its analysis, the Court assumes without deciding that Defendant is a "video service provider" under the VPPA.

VPPA.[22] Like Plaintiff in this case, the plaintiffs in *Carter* alleged that they were "subscribers of good or services from a video tape service provider" under the statute. The issue for the court was therefore whether the plaintiffs' subscription to hgtv.com's newsletter rendered them "subscribers" within meaning of the VPPA (*i.e.*, that they subscribed to "goods or services of a video tape service provider").

The court began by recognizing that the VPPA does not define "subscriber," but that dictionary definitions indicate that "subscriber" is a person who "imparts money and/or personal information in order to receive a future and recurrent benefit. . . ." *See id.* at *4 (internal quotation marks omitted). Although the plaintiffs contended that their subscriptions to hgtv.com's newsletter rendered them "subscribers," the court found that this "broad interpretation" was only plausible if the definition of "consumer" was read in isolation (contrary to canons of statutory interpretation). *See id.* at *5. The court went on to explain:

> In the statute's full context, a reasonable reader would understand the definition of "consumer" to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large. The VPPA makes it unlawful for a "video tape service provider" to "knowingly disclose[ ], to any person, personally identifiable information concerning any consumer of such provider...." 18 U.S.C. § 2710(b)(1) (emphasis added). A "video tape service provider" is defined as a person "engaged in the business ... of rental, sale or delivery of prerecorded video cassette tapes or similar audio visual materials...." *Id.* § 2710(a)(4). Thus, subsection (b)(1) provides a right of action to a "consumer" (e.g., "renter, purchaser, or subscriber") of "such provider" (e.g., one engaged in "the business ... of rental, sale or delivery

---

[22] Though the court's analysis in *Carter* is persuasive, the court was not always precise in its use of terminology. As reflected by the court's discussion, whether an individual is a "subscriber" in the abstract requires an inquiry into the relationship between the individual and the entity or thing to which the individual allegedly subscribes. *See Carter*, 2023 WL 3061858, at *4 (discussing dictionary definitions of "subscriber" relied on by other courts). Under the VPPA, however, the issue is not merely whether the plaintiff falls within the term "subscriber;" properly defined; instead, it is whether someone falls within the term "subscriber of goods or service of a video tape service provide" as properly defined for purposes of the VPPA. That is, for an individual to be protected by the VPPA, it is not enough for him or her merely to be a subscriber; he or she must subscribe to (be a subscriber of) particular materials—specifically, "goods or services of a video tape service provider." Though the court in *Carter* frames much of its discussion on whether the plaintiff in that case was a "subscriber," the analysis reflects that the court was in fact discussing whether the plaintiffs were "subscriber[s] of goods or services of a video tape service provider."

> of ... audio visual materials"). The definitions of "consumer" and "video tape service provider" are paired to some degree: renter with rental, purchaser with sale, and subscriber with delivery, all of which subsection (a)(4) applies to audio visual materials. Thus, the scope of a "consumer," when read with sections 2710(b)(1) and (a)(4), is cabined by the definition of "video tape service provider," with its focus on the rental, sale or delivery of audio visual materials. Section 2710(b)(1) provides for an action by a renter, purchaser of subscriber of audio visual materials, and not a broader category of consumers.

*See id.* at *6. The court further noted that the legislative history of the VPPA supported this conclusion. *See id.* Specifically, the court noted that

> The 1988 Senate Report notes that the definition of PII at section 2710(a)(3) is drafted "to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products." Senate Report 100-599, at 12.

*See id.* Based on its reading of the statutory text, which was bolstered by the legislative history, the court found that the plaintiffs were not "subscribers of goods or services of a video tape service provider" under the VPPA, because subscription to the newsletter was not sufficient to establish that the plaintiffs had subscribed to audio visual materials. *See id.* As explained by the court, the complaint did not "include facts that plausibly allege[d] that [the plaintiffs'] status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience. They were subscribers to newsletters, not subscribers to audio visual materials." *See id.*

The Court agrees with and incorporates the statutory interpretation of the court in *Carter*. Not only does the § 2710 (when read as a whole)[23] support the conclusion that a "consumer" is a

---

[23] The Court agrees with *Carter* that it is vital to read the VPPA *as a whole*. And when it is properly interpreted as a whole, it becomes clear that a plaintiff is not necessarily "a subscriber of video-tape related goods or services" *even if* the plaintiff can be considered a 1) subscriber, 2) of goods or services (of some kind); (3) from a video tape service provider. Instead, the plaintiff must be a subscriber of goods and services *in the nature of audio-video* content.

"subscriber" under the statute only when they subscribe to audio visual materials, but to conclude otherwise would lead to an unreasonable interpretation of the statute. Indeed, imagine a situation in which a website that provides video content on the stock market also permits individuals to subscribe to a newsletter regarding savvy investing. The newsletter, though created and disseminated by the same website that hosts the video content, does not itself include video content and instead provides tips on investing decisions in written form. It would be unreasonable to permit a plaintiff who subscribes to the newsletter in that situation to pursue a claim under the VPPA— the plaintiff's interaction with the website in that situation has nothing to do with video content and is ill suited for a claim under the *Video* Privacy Protection Act.

The court in *Carter* provided a similar and hypothetical scenario whereby application of the VPPA would be nonsensical and yet required by interpretations of the VPPA like the one offered by Plaintiff herein. In *Carter*, the court explained that hgtv.com also had an online shop that recommended "links to third-party-home-and-garden products," and that the hgtv.com disclosed on the website that it made money from the affiliate links. *See id.* at *5. Because a "consumer" includes a "purchaser" of "goods or services from a video tape service provider," under the plaintiff's reading of the VPPA, a plaintiff could file a claim under the VPPA based on a purchase made through an affiliate link. *See id.* The court found that this was an unreasonable interpretation.

As did the plaintiffs in *Carter*, Plaintiff contends that he is a "subscriber" under the VPPA because he signed up for an online newsletter. As with respect the complaint's allegations in *Carter* regarding accessing hgtv.com, the complaint in this case does not allege that an individual can only access the video content from 247Sports.com through signing up for the newsletter. Instead,

it appears from the complaint that any individual can access the video content on 247Sports.com without having to sign up for the newsletter or otherwise register for an account on 247Sports.com. Moreover, Plaintiff in this case does not even allege that he accessed video content through the receipt and review of the newsletter.

In light of the Court's finding that an individual is a "subscriber" under the VPPA only when he or she subscribes to audio visual materials, Plaintiff's allegation that his subscription to the newsletter renders him a "subscriber" is unavailing. As noted, there is no allegation in the complaint that Plaintiff accessed audio visual content through the newsletter (or at all, for that matter). The newsletter is therefore not audio visual content, which necessarily means that Plaintiff is not a "subscriber" under the VPPA.

In response to Defendant's argument that Plaintiff is not a "subscriber" of the kind falling within the protection of the VPPA, Plaintiff relies on *Lebakken v. WebMD, LLC*, 1-22-cv-644, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022). In *WebMD*, the court, without conducting any statutory interpretation, concluded that WebMD.com's newsletter fell within the "good or services" described in the VPPA. *See id.* at *3. The defendant argued that the newsletter did not fall under the VPPA because it was "too attenuated from [the plaintiff's] viewing of any WebMD videos to state a claim under the VPPA." *See id.* In rejecting this argument, the court reasoned that "goods or services" should be construed broadly to "encompass all parts of the economic output of society." *See id.* (internal quotations omitted).

The *WebMD* decision is admittedly favorable to Plaintiff in this case. Of course, *WebMD* is not binding authority, and in light of the analysis provided by the court in *Carter* (which, concededly, is also not binding), the Court finds the analysis in *WebMD* unpersuasive. Unlike the court in *Carter*, the court in *WebMD* did not engage in any meaningful statutory interpretation of

the VPPA nor did it consider (as did the Court above) the ramifications of allowing VPPA claims based on "goods or services" that are not audio-visual in nature. Therefore, the Court declines to follow the reasoning and holding of *WebMD*.

In summary, based on the Court's interpretation of "subscriber" in the VPPA, Plaintiff fails to state a claim under the VPPA because Plaintiff is not a "subscriber of goods or services of a video tape service provider" (and therefore is not a "consumer") by virtue of registering or signing up for the 247Sports.com's newsletter. The complaint therefore fails to state a claim under the VPPA.

<u>CONCLUSION</u>

For the reasons stated herein, Defendant's motion to dismiss at Doc. No. 16 is GRANTED in part and DENIED in part. Specifically, Defendant's Motion is denied insofar as it requests dismissal based on lack of standing. The Motion is GRANTED insofar as it requests dismissal for failure to state a claim upon which relief can be granted. This is the final order in the case. All relief being denied, the Clerk shall enter judgment. *See* Fed. R. Civ. P. 58(b)(1)(C).

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE